UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

NICOLE MARY CZANDERNA

      Plaintiff,

v.                                      Case No.  3:14cv615/CJK

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

_____/

## MEMORANDUM ORDER

      This case is now before the court pursuant to 42 U.S.C.  § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Nicole Czanderna's application for Supplemental Security Income ("SSI" ) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83.  The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and FEDERAL RULE OF CIVIL PROCEDURE 73 for all proceedings in this case, including entry of final judgment.  After review of the record, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner, therefore, will be affirmed and the application for benefits denied.

## ISSUE ON REVIEW

      Ms. Czanderna, ("claimant" or "plaintiff") raises one issue:  the Appeals Council ("AC") failed to give sufficient weight to the opinion Dr. Sarazin expressed

in the "Supplemental Questionnaire as to Residual Functioning Capacity" (SQRFC).
Plaintiff argues the AC improperly rejected Dr. Sarazin's opinion based on Ms.
Czanderna's GAF scores and college attendance.  Claimant argues Dr. Sarazin's
opinion is consistent with the record, and requests the determination of the Appeals
Council be reversed and remanded for further consideration.

<u>PROCEDURAL HISTORY</u>

On May 20, 2011, claimant filed an application for SSI, alleging disability
beginning April 26, 2010.[1]  T. 24.  The application was denied initially on July 28,
2011,  T. 24,  and upon reconsideration on October 11, 2011.  T. 70.  Claimant was
thereafter granted a hearing with an Administrative Law Judge ("ALJ").  T. 24.  Ms.
Czanderna appeared before the ALJ for a hearing via teleconference on December 7,
2012.  T. 24.  On May 30, 2013, the ALJ issued a decision denying claimant's
application for SSI.  T. 30.  The Appeals Council granted claimant's request for
further review on September 19, 2014, and subsequently denied her application on
October 31, 2014.  T. 4-8.  The case is now before the court pursuant to 42 U.S.C. §
405(g), for review of a final determination by the Commissioner denying claimant's
application for SSI.

---

[1] The administrative record, as filed by the Commissioner, consists of six volumes (docs. 6-2
through 6-7), and has 285 consecutively numbered pages.  References to the record will be "T.," for
transcript, followed by the page number.

Case No: 3:14cv615/CJK

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relative to the issues raised in this appeal:

- Claimant has not engaged in substantial gainful activity sine May 20, 2011, the application date.  T. 22.

- Claimant has the following severe impairments:  a personality disorder with obsessive and compulsive tendencies, a history of Tourette's syndrome, depression, and anxiety.  T. 22.

- Claimant's impairments or combination of impairments do not meet the criteria of those listed in sections  12.04 and  12.09 of 20 C.F.R.  Part  404, Subpart P, Appendix 1.  T. 22.

- "Claimant has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels.  However, she is subject to a variety of non-exertional mental limitations.  For example, claimant can generally attend to work tasks or assignments in 2-hour increments of an unskilled or lower semi-skilled variety.  She can generally remember, understand, and carry out such assignments or deal with such assignments over an 8-hour workday.  The claimant would need to have infrequent interaction with members of the general public, meaning a little less than occasionally, but more than rare (or in the 15-20% category).  The claimant would need to have the same level of interaction with supervisors, and as a whole would need to work more independently.  She also should not be placed in an employment position in which she is expected to be a part of production team or function as part of an assembly line."  T. 25.

- Considering the claimant's age, education, work experience, and residual functional capacity ("RFC"), there are jobs that exist in significant numbers in the national economy that the claimant can perform.  T. 28.

- Claimant has not been under a disability, as defined in the Social Security Act, since May 20, 2011, the date the application was filed.  T. 29.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards.  *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'"  *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at 1439).  Although the ALJ's decision need not be supported by a preponderance of the evidence, therefore, "it cannot stand with a 'mere scintilla' of support."  *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *See Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[2]

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

---

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986). The Eleventh Circuit has explained the operation of step five, as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that [s]he is unable to perform the jobs

that the Commissioner lists.  The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001) (citing *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999)).

Step five (or step four in cases in which the ALJ decides a claimant can perform her past work) is generally where the rubber meets the road.  At that point, the ALJ formulates the all-important residual functional capacity.  Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that residual functional capacity.  The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain).  Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[3]  "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[4]  20

---

[3] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.)  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.1520(a)(4).

[4] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

(3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence.  In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 404.1512(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get

C.F.R. § 404.1545(a)(1).  Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by the disappointed claimant.

FACT BACKGROUND AND MEDICAL HISTORY[5]

At the hearing before the ALJ, Ms. Czanderna offered testimony as to her health and daily activities.  Claimant was born September 17, 1986, and filed for SSI on May 20, 2011.  T. 20.  She believes she became disabled on April 26, 2010, due to severe anxiety, obsessive compulsive disorder, and Tourette's syndrome.  T. 20. Plaintiff finished high school, was employed as a computer tech assistant, and completed multiple classes at Pensacola Junior College while pursuing a degree in graphic design.  T. 43-44, 49.  She finished two years of college and earned mostly good grades.  T. 208-209.  Though plaintiff did not have a driver's license, she did have a learner's permit and frequently received rides from her mother, friends, or longtime boyfriend.  T. 47.  Ms. Czanderna lives with her boyfriend and two other

---

medical reports from your own medical sources.  (See §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

[5] The recitation of medical and historical facts of this case, as set out below, is based upon my independent review of the record.  Although intended to be thorough and to provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as called for in the Analysis section.

Case No: 3:14cv615/CJK

roommates, where she completes chores, walks to and from the grocery store, cooks and prepares meals, and occasionally attends social events.  T. 53, 145.  Claimant told the ALJ she was able to accomplish these tasks with the help of medication, and was "usually fine if... on Klonopin."  T. 48, 51, 52, 56.  Ms. Czanderna also mentioned her tics were "getting better" after taking Risperdal.  T. 55.  Claimant enjoys occasionally eating out at restaurants, reading books, surfing the web, playing computer games, going on Facebook, watching class lectures and YouTube videos, as well as doing freelance graphic design and artwork.  T. 28, 50, 60.

Medical records also  appear in the evidence before the Commissioner.  On April 27, 2010, claimant began treatment and counseling at Lakeview Center in Pensacola, Florida.  T. 241.  Ms. Czanderna described having "a horrible anxiety issue," particularly in crowds or classroom settings, feelings of worthlessness, and experiencing severe tics and throat clearing.  T. 241, 248.  Guido Ludergnani, M.D., the treating physician, as well as Nicole Lopez, MA, LMHC, assessed and diagnosed claimant with generalized anxiety disorder, obsessive-compulsive disorder, and Tourette's syndrome.  T. 242.  Dr. Ludergnani prescribed Celexa for tic symptoms, as well as other medications to address the anxiety and OCD.  T. 243.  Dr. Ludergnani determined claimant had a modified global assessment of functioning (GAF) score of 60.[6]  T. 242.

---

[6] The GAF rating has two components: (1) symptom severity and (2) social and occupational functioning.  The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within the range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 34 (4th ed., text rev., 2000).  A GAF between 51 and 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational,

In a follow-up appointment on May 26, 2010, claimant reported the prescribed "medication is working because she [was] feeling less anxious," and by July 21, 2010, her "anxiety ha[d] drastically improved." T. 237-39. Ms. Czanderna noted the drugs were "very helpful in terms of controlling the anxiety," because it was "less frequent." T. 235. Dr. Ludergnani indicated claimant was "cooperative and pleasant," made "good eye contact," and her "insight and judgment are good." T .235. Treatment notes from the appointment further indicated claimant was "alert and oriented," and her "cognitive status is grossly intact." T. 235. Nevertheless, Ms. Czanderna reported she still experienced motor tic symptoms. T. 235.

By September 29, 2010, however, claimant reported the "tics... ha[d] improved," and that "Citalopram has been very helpful." T. 234. Treatment notes show "no motor abnormalities were present," and plaintiff was "mellower, more relaxed, and laid back." T. 234. The "anxiety has settled, [claimant] can go out...[and] feels very comfortable." T. 234. Again, plaintiff was "alert,...oriented," and "coherent," with "good" judgment and cognition "grossly intact." T. 234.

---

or school functioning;" a GAF between 61 and 70 indicates "mild" symptoms or "some difficulty in social, occupational or school functioning," but "generally functioning pretty well;" a GAF score between 71 and 80 indicates transient and expectable reactions to psychosocial stressors and no more than an slight impairment in social, occupational, or school functioning; a GAF score between 81 and 90 indicates no or minimal symptoms and good functioning in all areas. *Id.* The most recent edition of the Diagnostic and Statistical Manual no longer recommends use of the GAF scale, acknowledging that "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

On May 6, 2011, Ms. Czanderna claimed the Citalopram and Clonazepam had been "partially helpful," as she was still having symptoms of OCD, anxiety, and tics. T. 229. The notes reveal claimant had "not been compliant with treatment." T. 229. She, nevertheless, reported to be "fine," having had "no adverse reactions from treatment," and mentioned her "anxiety is not as frequent or as intense as it used to be." T. 229. Dr. Ludergnani found claimant made "good eye contact," was "alert and oriented," as well as "cooperative and pleasant," and gauged claimant's GAF score to be 60. T. 229.

According to treatment notes from June 10, 2011, "the combination of Tenex, Clonazepam, and Citalopram has been very useful. [Claimant] no longer has tics... [and] is very content with the outcomes." T. 227. Czanderna experienced "no adverse reactions," and "perform[ed] well throughout the day." T. 227. Dr. Ludergnani observed claimant again "made good eye contact," and maintained good judgment and insight. T. 227. Czanderna expressed her desire to "continue on the current modality of treatment," and Dr. Ludergnani prescribed three months worth of medication, recommending claimant come back "in two or three months." T. 228.

On November 17, 2011, Dr. John Sarazin became Ms. Czanderna's treating physician. T. 271-72. Claimant reported experiencing some "breakthrough symptoms... [of] tic activity" and "some anxiety" during the day T. 271. Plaintiff mentioned "difficulty in crowded situations," but reported she did "fairly well on her medications." T. 271. Dr. Sarazin observed both blinking and throat-clearing tics, and assessed claimant's GAF as 55. T. 271. The treatment notes listed claimant's insight and judgment as "fair," and she described her own mood as "okay." T. 271.

On January 17, 2012, claimant returned for a followup and reported "no benefit from increasing medications," and felt "more anxious all the time." T. 273. Plaintiff noted the persistence of "tic behaviors," and still experienced "agitation, irritability...[and] angry outbursts." T. 273. Dr. Sarazin observed claimant "makes good eye contact and answers questions logically" with "fair" insight and judgment. T. 273. Dr. Sarazin ordered a followup appointment within "two to four weeks to continue to assess [claimant's] level of functioning." T. 274.

The treatment notes from June 4, 2012, indicate plaintiff still felt "very anxious outside the house...[and] around people," and reported "the increase in medications have not helped." T. 276. Plaintiff, however, had "no complaints of tic behaviors," and her recorded GAF score was 57. T. 276. Czanderna demonstrated "good eye contact and answer[ed] questions logically." T. 276. Again, Dr. Sarazin ordered a followup visit within "two to four weeks." T. 276.

On October 18, 2012,[7] claimant reported "an increase in tic-type behaviors," with "significant arm movement, facial movement, and throat-clearing." T. 280. Dr. Sarazin noted the tics "seem to be worse now...[and] have increased in intensity and frequency." T. 280. Ms. Czanderna indicated "Celexa and BuSpar have been helpful with depression and anxiety." T. 280. She further told Dr. Sarazin that having "recently r[u]n out of BuSpar...[s]he has been more anxious." T. 280. Claimant described her "mood as being good," and her GAF was assessed to be 55. T. 280. Dr.

---

[7] Claimant scheduled two separate appointments following June 4 and prior to October 18. The first, on July 2, 2012, claimant showed up an hour late and had to reschedule, and the second, on September 4, 2012, claimant did not show up at all. T. 278-79.

Sarazin noted plaintiff continued to make "good eye contact and answer questions logically." T. 280.  Dr. Sarazin  recommended another followup appointment within "two to four weeks" to "assess the patient's level of functioning."  T. 281.

On August 9, 2013, Dr. Sarazin completed a "Supplemental Questionnaire as to Residual Functional Capacity" (SQRFC).  T. 282-85.  The SQRFC is a two-page medical questionnaire consisting of twelve questions. The questions related to claimant's abilities to function within a work or social environment and the impact, severity, and duration of claimant's diagnosis.  T. 282-285.  The questions had pre-formatted answers on a Likert-type scale, as well as a blank space for additional comments.  T. 283-84.  On the form, Dr. Sarazin checked-off "Extreme" for several questions including: an estimated restriction of ADLs; episodes of decompensation within a work or work-like setting; limitations as to understanding instruction; and limitations in responding appropriately to both co-workers and supervisors.  T. 283-84.  Dr. Sarazin checked the answer "Marked" for questions pertaining to: difficulty in social functioning and limitations in performing simple and repetitive tasks in a work setting. Dr. Sarazin also answered "Frequent" regarding claimant's "estimated deficiencies of concentration, persistence, or pace" in completing tasks in a timely manner.  T. 283-284.  Dr. Sarazin indicated a psychological evaluation was never obtained and the patient is "disabled from full-time continuous employment." T. 284.  Dr. Sarazin's opinion included a brief letter signed and dated, and attached to the SQRFC. T. 282.  The letter listed claimant's diagnosis and stated, "As with many individuals with mental health problems, this diagnosis inhibits the ability to be successful in social and professional settings at times."  T. 282.

ANALYSIS

Ms. Czanderna raises one issue.  She claims the Appeals Council failed to provide good cause for disregarding Dr. Sarazin's medical opinion as expressed in the SQRFC.  T. 282-85.  The Appeals Council rejected Dr. Sarazin's opinion because it was "not supported by the overall record," based on claimant's GAF scores and "recent college attendance."  Claimant argues it is improper for the AC to "determine the extent of an individual's mental impairment based solely on a GAF score," as "GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  (Doc. 8, p. 11).  Plaintiff further contends the Lakeview treatment notes clearly indicate the "difficulties Plaintiff had in attending college," including having to sit "near the door in school," where her tics were "particularly bothersome."  (Doc. 8, p. 11).  Noting these factors, claimant contends "the opinions of Dr. Sarazin were not inconsistent with the medical evidence and good cause did not exist for rejecting his assessment."  (Doc. 8, p. 11).  Claimant therefore requests the determination of the Commissioner be reversed and remanded for further consideration.

"When the Appeals Council grants review, the Appeals Council decision is reviewable as the final decision of the Secretary."  *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir.1994).  The court can reverse a finding of the Secretary if not supported by substantial evidence.  42 U.S.C.§ 405(g).  This does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980).  In its review, however, the court abstains from reweighing the evidence or substituting its own judgment for that

of the Secretary.  *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977).

Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).  "Good cause" exists when:  (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Phillips,* 357 F.3d at 241; *see also Lewis*, 125 F.3d at 1440 (citing cases).

In this case, Dr. Sarazin's opinion is not "bolstered by the evidence," which supports a contrary finding.  The treatment notes from Lakeview Center and the record as a whole indicate claimant: (1) was capable of and did participate in a wide variety of ADLs, (2) was consistently logical, coherent, and of sound cognition, and (3) frequently reported improvement in her condition as a result of medication and regular treatment.  Furthermore, when claimant reported setbacks or persistence in symptoms, such setbacks often followed large gaps of overdue treatment where Czanderna's condition could not be monitored and her medication could not be managed.  In addition to being inconsistent with the record, Dr. Sarazin's opinion is too conclusory to be entitled controlling weight.  The SQRFC opinion furnished by Dr. Sarazin was a  preprinted check-off form that cited no clinical or medical findings whatsoever and provided no insight into or rationale for the expressed conclusions.  Therefore, good cause does exist to discount the opinion of Dr. Sarazin, as expressed on the SQRFC.

Dr. Sarazin's opinion expressed in the SQRFC estimated the claimant had "extreme" limitations in "activities of dailiy living."  T. 283.  The record, however, shows that Ms. Czanderna participated in a wide variety of activities of daily life including: completing high school; attending and successfully completing college classes; making trips to the store and the occasional restaurant; maintaining long term relationships with her boyfriend, mother, and roommates; surfing the web; watching videos; doing freelance art and graphic design; and attending social events.  T. 28, 43-44, 47, 49-50, 53, 60, 145, 208-09.  The inconsistency between claimant's self reported ADLs and Dr. Sarazin's opinion provides good cause for giving less than controlling weight to that opinion.

Dr. Sarazin's opinion (SQRFC) also indicates claimant had an "extreme" inability to "understand, carry out, and remember instructions," as well as an "extreme" inability to "respond appropriately" to both supervisors and co-workers.  T. 283. Physicians at Lakeview Center observed in their interactions with Ms. Czanderna that she was consistently "pleasant" and maintained "good eye contact."  Her cognitive abilities were "grossly intact," she was "coherent… alert and oriented," and she answered questions "logically."  T. 229, 227, 234, 235, 271, 273, 276.  Claimant's treating physicians, Dr. Ludergnani and Dr. Sarazin, both consistently assessed claimant's GAF score to range between 55 and 60 throughout her treatment at Lakeview Center.  T. 229, 242, 271, 276, 280.  Plaintiff argues a GAF score alone should not "solely" determine "the extent of an individual's mental impairment." (Doc. 8. p. 11).  This argument, however, is of little consequence as claimant's GAF scores were but one component of a comprehensive analysis of the medical record which, in

addition to the  GAF assessments, included: treatment notes, physician observations, claimant's statements, and claimant's ADLs.[8]  In evaluating all of these factors, the court is fulfilling its "responsibility to scrutinize the record in its entirety," *Strickland*, 615 F.2d 110,  and is not determining "the extent of an individual's impairment based solely on a GAF score."  (Doc. 8, p. 11).

Claimant reported to the ALJ that prescription medication reduced her symptoms and allowed her to complete activities of daily life, saying she was "fine" so long as she was on her medicine.  T. 48, 51, 52, 55, 56.  Claimant also consistently showed signs of improvement, responding well to regular treatment and medication management. On May 26, 2010, after one month of treatment, Ms. Czanderna reported the "medication is working because she [was] feeling less anxious." T. 239.  On July 21, 2010, claimant's "anxiety ha[d] drastically improved," and the drugs had been "very helpful in…controlling the anxiety" as it was "less frequent."  T. 237-39.   On September 29, 2010, claimant reported the "tics… ha[d] improved" and the "Citalopram had been very helpful."  T. 234.  Claimant felt "mellower, more relaxed and laid back."  T. 234.  Plaintiff's "anxiety ha[d] settled," she was able to "go out," and she felt "very comfortable."  T. 234.  By May 6, 2011, claimant reported the anxiety to not be "as frequent or as intense as it used to be," and experienced "no adverse reactions from treatment."  T. 229.  In June 2011, the "combination of Tenex, Clonazepam, and Citalopram had been very useful. [Claimant] no longer has tics…[and] is very content with the outcomes… The patient is performing well

---

[8] The vocational expert at the ALJ hearing also determined and provided examples of several jobs in today's economy compatible with claimant's listed occupational limitations and requirements.  T. 61-67.

throughout the day." T. 227. Ms. Czanderna reported "no adverse reactions" to the medications and expressed a desire to continue treatment given its effectiveness. T. 228. These reports of improvement and positive response to treatment are contrary to the dire view of claimant's condition depicted on the SQRFC.

When claimant did experience setbacks or dissatisfaction in the way her symptoms affected her daily life, T. 229, 271, 280, 282-85, it often followed large gaps in treatment, a lack of medication management, or not adhering to treatment regimens set forth by physicians. On May 6, 2011, claimant said her medications had only been "partially helpful" as she still experienced breakthrough symptoms of motor tics. T. 229. The treatment notes, however, reveal claimant had "not been compliant with treatment" and was two months overdue on the recommended treatment and medication management schedule. T. 229. Claimant habitually went several months without seeing her physician despite medical recommendations to return for follow-up visits and further assessment. At a June 10, 2011 appointment, Dr. Ludergnani recommended claimant schedule a follow-up within "two or three" months. Claimant did not return until November 17, 2011, more than five months later. T. 227-28, 271. At this appointment, Dr. Sarazin took over as attending physician, and Czanderna reported experiencing "breakthrough symptoms" of both tic activity and anxiety. T. 271. Despite reporting symptoms to Dr. Sarazin, claimant also reported that she typically did "fairly well on her medications." T. 271.

At an appointment on January 17, 2012, and following a previous adjustment in medication, claimant reported persistence in symptoms. T. 274. Dr. Sarazin again modified the medication regimen and recommended plaintiff return in "two to four

weeks" for further assessment and management.  T. 274.  Ms. Czanderna did not return until June 4, nearly five months later, when she claimed the medications "have not helped."  T. 276.  Dr. Sarazin continued to recommend follow-up appointments within "two to four weeks" in an effort to better monitor claimant's level of functioning and adjust accordingly.  T. 276.

Following the June 4, 2012, appointment, plaintiff waited almost five months before returning to Lakeview Center on October 18, 2012.  T. 280.  At this return appointment, claimant had a "significant" increase in both the frequency and intensity of motor tics, after registering "no complaints of tic behaviors" at her last visit.  T. 276, 280.  Claimant also mentioned that because she "recently ran out of BuSpar," she "has been more anxious" and that "Celexa and BuSpar have been helpful with depression and anxiety."  T. 280.  Once more, Dr. Sarazin requested plaintiff follow-up within "two to four weeks" to continue assessment and medication management. T. 281.  Ms. Czanderna's next and last recorded appointment with Dr. Sarazin, however, did not take place until August 9, 2013, almost ten months later.  At this appointment, Dr. Sarazin completed the SQRFC, agreeing claimant had "extreme" limitations in ADLs; the ability to "understand, carry out, and remember instructions;" and the ability to "respond appropriately to supervision" and "co-workers." T. 283-84.  The SQRFC also denoted that Ms. Czanderna had "marked" limitations in the ability to "perform simple" or "repetitive tasks in a work setting" and the ability to maintain social functions and that claimant therefore was "disabled from full-time continuous employment."  T. 283-84.  Accompanying the SQRFC was a brief letter signed by Sarazin and Erik Sternung, a Psychiatric Nurse Practitioner. The letter included claimant's diagnosis along with

a general statement that "this diagnosis inhibits the ability to be successful in social and professional settings at times," as was common of "many individuals with mental health problems."  T. 282.

Plaintiff contends that because the Lakeview treatment notes show the anxiety and tics posed "difficulties" in attending college, the SQRFC is not inconsistent with the medical evidence. (Doc 8, p. 11).  This argument is insufficient, however, in resolving the much larger and pervasive inconsistencies pertaining to claimant's supposed extreme limitations in ADLs, ability to understand, and ability to comprehend, which taken together "support a contrary finding," and is therefore "not bolstered by the evidence."  *Phillips*, 357 F.3d at 241.  Claimant still attended and completed several college courses despite reported "difficulties," and according to her transcript, earned mostly good grades.  T. 208-09.   She also shops, cooks, attends social events, and has maintained several stable and enduring relationships. Furthermore, claimant is consistently noted to be logical, alert, oriented, and cognitively intact.[9]   Thus, plaintiff's argument is insufficient to wipe away the significant inconsistencies between the SQRFC and the medical record as a whole, which supports a contrary finding to the one expressed in Dr. Sarazin's opinion.

In addition to being inconsistent with the overall treatment notes and medical findings, Dr. Sarazin's opinion expressed on the SQRFC was too conclusory to be entitled to controlling weight.  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or

---

[9] Dr. Sarazin himself reported Ms. Czanderna "makes good eye contact and answers questions logically," despite reporting on the SQRFC she had "extreme" limitations in responding appropriately and understanding, carrying out, or remembering instructions.  T. 274, 284.

laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  A brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability.  *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987); *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).

The law concerning conclusory statements is particularly applied where a doctor, even one who has treated the claimant, expresses opinions on a preprinted or "check-off" form.  Such opinion evidence will not bind the Commissioner.  Indeed, courts have found that such preprinted forms do not provide persuasive evidence of the validity of the opinions expressed therein.  *See Hammersley v. Astrue*, No. 5:08-cv-245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("Check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions." (citing *Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985);  *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993))).  Although such forms are admissible, "they are entitled to little weight and do not constitute 'substantial evidence' on the record as a whole."  *O'Leary v. Schweiker*, 710 F. 2d 1334, 1341 (8th Cir. 1983); *Teague v. Astrue*, 638 F. 3d 611, 616 (8th Cir. 2011) ("Given that the "check-off form" did not cite any clinical test results or findings and Dr. Lowder's previous treatment notes did not report any significant limitations due to back pain, the ALJ found that the [form] was entitled to "little evidentiary weight.").

The SQRFC completed by Dr. Sarazin on August 9, 2013, was a preprinted "check-off" form with pre-formatted answers arranged on a gradual scale.  T. 283-84. The two-page form offered little to no detail about the patient's condition or limitations and included only five hand-written words by Dr. Sarazin.  T. 284.  The form provides no insight or explanation into Dr. Sarazin's rationale for the answers he provided, as highlighted by the lack of "Additional Comments" in the space provided.  T. 284.  The SQRFC, therefore, is of little probative value as it is too conclusory to be entitled to controlling weight, and further provided the AC with good cause for rejecting Dr. Sarazin's opinion. Therefore, the findings of the Appeals Council are supported by substantial evidence.

<u>CONCLUSION</u>

In sum, the findings of the Appeals Council are supported by substantial evidence, and there exists "good cause" in not granting "controlling weight" to the SQRFC completed by Dr. Sarazin because it is inconsistent with the evidence  and far too conclusory to be entitled to controlling weight in the decision of the AC.

Accordingly, it is ORDERED:

1.    The decision of the Commissioner is AFFIRMED and plaintiff's application for Supplemental Security Income is DENIED.

2.    The clerk is directed to close the file.

DONE AND ORDERED this 9th day of June,  2015.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

Case No: 3:14cv615/CJK